## WILSON v. TEAGUE INDEPENDENT SCHOOL DIST.

### No. 3027.

Court of Civil Appeals of Texas. Waco.

June 26, 1952.

Rehearing Denied Sept. 25, 1952.

W. W. Mason, Mexia, for appellant.

H. L. Williford, Fairfield, for appellee.

TIREY, Justice.

Appellant brought this suit against appellee to recover the balance of his salary accruing to him by virtue of a written contract between him and appellee beginning July 1, 1949 and ending June 30, 1950. The contract as made provided for a salary of $4,883 for the year, which sum included $875, Federal Aid Funds for travel expenses. The cause was tried without the aid of a jury and judgment was rendered in favor of the School District against appellant and he has perfected his appeal to this court.

At the request of appellant the trial court filed findings of fact and conclusions of law. Findings 1, 2, 3 and 4 are to the effect that appellant entered into a contract with the Teague Independent School District to teach vocational agriculture in said school for the year beginning July 1, 1949 and ending June 30, 1950, and at the rate of the minimum foundation program schedule and that the salary was fixed at $4,008 for the year with a travel expense allowance not to exceed $875; that the contract provided in part that Ruel Wilson shall "teach

to the best of his skill and ability, and shall be governed and discharge the duties required by the school laws of this State and such rules and regulations as may be determined by said District, Superintendent of schools and the Principal of his Department;" that Wilson entered upon his duties and served in such capacity until January 22, 1950; that the issue of the Teague Chronicle of January 5, 1950, a newspaper published weekly at Teague, Texas, carried the announcement of appellant to the effect that he was a candidate for County School Superintendent of Freestone County, Texas, for the primary election of that year in July; (V) that Llewellyn Notley, Superintendent of Schools for said District, wrote W. E. Lowry of the State Board for Vocational Education, at Austin, Texas, on January 7, 1950, advising Lowry that Wilson had announced for County Superintendent of Freestone County, Texas, inquiring if this was a violation of the Hatch Act, 5 U.S.C.A. § 118i et seq. and if it would jeopardize the right of the District to collect its subsidy under the Smith-Hughes Act, 20 U.S.C.A. § 15i et seq.; that Lowry answered this letter January 9, 1950, and advised Notley that the continued employment of Wilson in said position would definitely place its agricultural unit in jeopardy. Further Lowry requested the date of Wilson's announcement in the campaign, as he stated that he expected to make this the date of the cancellation of its contract with said School District, insofar as same affected the agricultural position then held by Wilson; (VI) that so long as Wilson continued to run for public office, the State Board for Vocational Education would not pay his salary or traveling expenses as it had theretofore contracted with said District to do; and that if said contract be continued with Wilson, then said District would have to pay out of local funds the balance due for said contract year, or approximately $2,004 in salary, and any and all expenses not exceeding the sum of $875, none of which amounts was set up in the school budget for said year to be paid out of local funds; that said District would sustain a loss of $2,004 and any expense money, not exceeding $875, if Wilson continued to

teach in his then present position for the balance of said school year, and also continue to run for the office of County Superintendent; (VII) that Wilson had taught in said school for more than four years in this same position and knew what funds his salary was to be paid from; (VIII) that at a meeting of the board of trustees for said District on Jaunary 13, 1950, at which meeting all of the trustees were present, the letter from Lowry was exhibited to all of the trustees, and all of the trustees reached the conclusion that Wilson could not continue to teach and run for County Superintendent, although no action was taken by said Board on said contract at this meeting; that during the meeting Wilson was called in and shown this letter from Lowry, and excerpts from the Hatch Act; that after some discussion Wilson stated to the Board members that he was going to continue to run for office; however, at the request of the Board he agreed to stay on long enough to give the mid-term examinations; that he did remain and give said mid-term examinations. Upon the completion of said mid-term examinations Wilson, on or about January 22, 1950, delivered his keys to Gregory, high school principal, and told him that he was quitting; that although in this meeting of January 13, 1950, Wilson was given additional time to check on the correctness of Lowry's letter of Jaunary 9, 1950, he never checked further and never reported back to said Board, and after the delivery of his keys to Gregory, Wilson never again reported for duty under said contract; (IX) that said School District never fired Wilson, and the only resignation tendered by Wilson to said District was the written resignation effective June 30, 1950; (X) that at a meeting held on February 3, 1950, the Board employed J. E. Wells to fill the unexpired term of Wilson, which said contract was approved by the State Board for Vocational Education; that prior to this time the State Board for Vocational Education had cancelled its contract with said District covering the employment of Wilson; (XI) that the contract had between the School District and Wilson, and the contract had with the School District and the State Board for Voca-

tional Education was all one contract, and each was a part of the other. This is found as a fact from plaintiff's pleadings, from the fact that the contract between the District and Wilson was subject to the school laws of this State and rules and regulations as determined by the District, the Superintendent of Schools and the Principal of his department, and for the further reason that the funds as set up to be paid to Wilson for this contract were set up as coming from the State and Federal funds, and not local funds; and no provision had been provided for the payment of said contract out of local funds and thus without looking to the contract between said District and State Board for Vocational Education, plaintiff could not show that any funds were within anticipation of the parties as payment of the amount set forth in the contract for said year; (XII) that the contract by and between the School District and the State Board for Vocational Education, as applied to the contract of Ruel Wilson for school year July 1, 1949 to June 30, 1950, provides, among other things, the following: that said Agreement has been designated for (1) salaries of instructors under the Gilmer-Aikin Minimum Foundation Program (Vocational Teacher Unit) and (2) for services and other allowable purposes to be reimbursed from Special Vocational State and Federal Funds; that said agreement is in the amount of $4,883, of which $4,008 is total salary of Wilson, and the sum of $875, travel pay per year; said School District agrees that all vocational instruction will be conducted in accordance with the provisions of the Texas State Plan for Vocational Education; and that all monies due said District from the State Board for Vocational Education would be deposited to its credit; that the State Plan for Vocational Education in Texas, is a contract between the Federal Government and the State of Texas for the use of the Smith-Hughes and the George Barden money.

### Conclusions of Law

(I) There was a voluntary abandonment of said contract by the School District and by Wilson; that each came to the understanding—that is, the members of the Board of Trustees and Wilson—that Wilson could not teach and run for office, and thus the parties to said contract mutually abandoned and terminated said contract; (II) that the acts and conduct of Wilson, if he continued in his then employment with said District and continued to run for a county office, would cause said School District a loss of $2,004 and expenses not to exceed $875. This was a breach of said contract on the part of Wilson, brought about by his own acts and conduct, and not by anything the said School District did; (III) that Wilson breached his contract with said District, voluntarily agreed to its abondonment and termination, and said contract was abandoned by the parties.

After appellant had notice of the above findings of fact and conclusions of law he made request for additional findings of fact and conclusions of law and the court filed the following: "The findings and conclusions are cumulative of and in addition to the findings heretofore made, and do not take the place of the findings heretofore made: Findings of Fact: So far as the contract itself reflects on its face, the only parties to the contract by and between Teague Independent School District and Ruel Wilson, were said District and said Ruel Wilson; however, under the evidence in this case, as heretofore set out in my original findings of fact and conclusions of law filed on October 30, 1951, I found that this contract by and between said Teague District and Ruel Wilson was a part of that contract by and between said Teague District and the State Board for Vocational Education, and I now find that all was one contract, each a part of the other, and same should be construed together; (2) a contract was made by and between the Teague Independent School District of Freestone County, Texas, and the State Board for Vocational Education, for the school year beginning July 1, 1949, and ending June 30, 1950, as applied to the contract of Ruel Wilson for the teaching of Vocational Agriculture in said Teague District for said school year, which said contract fixed the salary of Ruel Wilson at $4008.00, and expenses not exceeding $875.00, and provided that instruction thereunder would be sub-

ject to the provisions of the Texas State Plan for Vocational Education; (3) Ruel Wilson was a party to this contract by and between said Teague District and the State Board of Vocational Education, which I found to be true in my original findings of fact and conclusions of law filed on October 30, 1951, and which I now find to be true; (4) the contract by and between Teague District and Ruel Wilson provides on its face that it is not subject to change or modification unless same be made in writing between the parties; however, said contract further provides that the said Ruel Wilson shall be governed and discharge the duties required by the school laws of this State and such rules and regulations as may be determined by said District, Superintendent of Schools and the principal of his department; (5) Ruel Wilson was not prohibited by his contract with the Teague Independent School District from announcing his candidacy for any public office; (6) the Teague District itself has no policy or rule that prohibits a teacher or employee of said School from entering into politics; (7) there are no written provisions in the contract by and between said Teague District and the State Board for Vocational Education that prohibits a vocational agriculture teacher from announcing his candidacy for public office, and there is nothing in writing in said contract that provides for its termination in case of such announcement; however, said contract provides that all vocational instruction is to be conducted in accordance with the provisions of the Texas State Plan for Vocational Education; and I find as a fact that the plan or policy of said State Board for Vocational Education is to terminate its contract with a school district as to the specific instructor announcing for public office; (8) the State Board for Vocational Education has a policy that prohibits an instructor in vocational agriculture from running for public office and continuing with his contract as a teacher, which policy was adopted prior to the time the contract sued on in this case was mutually abandoned by the parties thereto; (9) that such policy on the part of the State Board for Vocational Education is known to the employees of said Department, and was known to Wilson at the time he announced for public office; (10) other vocational agriculture teachers in various public schools of the State of Texas were not permitted to run for public office and Ruel Wilson was denied this right. The teacher in each case was told by the school board that if he wanted to run for office, he could resign, and this solved all the cases except the Teague case, in so far as cases came to the knowledge of the State Board for Vocational Education; (11) that the State Board for Vocational Education terminated its contract with said Teague District as to the employment of Wilson on or about January 22, 1950, this based on the fact that Wilson was paid through this date, and that the only monies lost by said Teague District under its agricultural contract for said school year 1949–50 was the money it paid to Davidson for a part of the period from January 22, 1950 to the time J. E. Wells began teaching; (12) the meeting of the Teague Board referred to was on January 13, 1950. I find that at this time the State Board for Vocational Education had not terminated its contract with said School District covering Ruel Wilson as agricultural teacher; (13) that after the Teague Board meeting of January 13, 1950, the matter of again writing to Lowry regarding the matter of Wilson teaching and running for office was taken up with Hawker by a Board member or members; however, Hawker never wrote any other letter or letters to Lowry regarding this. I find as his reason for this that the letter from Lowry of January 9, 1950 was sufficiently clear without additional information; and I find as a fact that Lowry would not have changed said ruling as set forth in his letter of January 9, 1950, to Notley, regardless of whether or not he was again written or contacted; (14) that Bowlen Bond advised Hawker that it was not a violation of the Hatch Act for Ruel Wilson to keep his position as instructor and run for public office; that Hawker advised Mr. Bond that he thought it might be a violation of the Hatch Act. I find this was not a violation of the Hatch Act; (15) J. E. Wells was advised by Notley or Hawker prior to January 22, 1950, that there was a vacancy in

the position of Agricultural Instructor in the Teague School; (16) the State Board for Vocational Education of the State of Texas in its contract with said School District had no right to hire or fire a teacher of said School District, after it had approved said teacher for said District; however, it did have the right to withhold payment and supervision under said contract.

"Conclusions of Law

"(1) It is the opinion of the Court that contract with the State of Texas or a State Agency are governed by the same rules of construction that apply to contracts between individuals; (2) a policy or custom may be a part of a contract without being adopted therein by the parties; (3) as a general rule of law one cannot breach a contract by doing or committing an act the contract does not prohibit; however, there might be exceptions to this rule, as a matter of public policy or for other reasons; (4) as to whether or not the fact that the party repudiating a contract will suffer a loss, would be a legal defense to such repudiation, would depend upon the facts of the particular case. I have not been asked to apply same to this case; (5) that the Teague District could not enforce its contract with the State Board for Vocational Education as applied to Wilson in this case, and permit him to continue to run for office. The State Board, in the interest of basic honesty, had a right to make this policy and the Teague District was required to conform thereto. The court, as heretofore stated in the original findings of fact and conclusions of law, filed October 30, 1951, based its decision in this case on the fact that the parties to this contract voluntarily abandoned same, and mutually agreed to its termination, which conclusion of law is amply supported by the pleadings and the evidence."

Point 1 assails the original Findings of Fact Nos. 6 to 8, which is to the effect that such findings are contrary to the undisputed evidence and have no support in the evidence. Point 2 assails the original findings of fact No. 9 and says in effect that it is not sustained by the evidence. Point 3 assails the original findings of fact Nos. 11 and 1

in the additional findings and says that such findings are not supported by the evidence and that they are contradictory to Points 4, 5 and 6. Point 4 is to the effect that the additional findings of fact No. 10 is contradictory of the record and has no support in the evidence. Point 5 is that the court erred in its original conclusion of law No. 1 that there was a voluntary abandonment of said contract between the Teague School District and Wilson because there was no pleading to support such finding and because such finding is contra to the undisputed evidence. Point 6 is that the court erred in its original conclusion of law No. 2 to the effect that the District would suffer a loss if Wilson continued to teach and run for County Superintendent. Point 7 is to the effect that the court erred in concluding as a matter of law that plaintiff voluntarily agreed to abandon and terminate his contract and that this conclusion has no support in the pleadings nor in the evidence. Point 8 is that the court erred in its conclusion of law, paragraph 2, wherein the court held as a matter of law that a policy or custom may be a part of a contract without being adopted by the parties and without the contract making the policy or custom a part of the contract and that there are no pleadings to support same. Point 9 is to the effect that the court erred in its conclusion of law No. 5 to the effect that the School District could not enforce its contract with the Vocational Department and permit plaintiff to run for office as the State Board has a right in the interest of basic honesty to make it a policy that a vocational agriculture teacher cannot run for public office because no policy of any contracting party is a part of a contract unless the contract makes policies of the parties a part of the contract by reference thereto and further says there are no pleadings to support this conclusion of law. Point 10 is to the effect that the court erred in rendering a take nothing judgment because there is neither pleading nor proof that there was a voluntary abandonment or mutual agreement of the parties to abandon the contract in suit.

The first question that must claim our attention is: Did appellee's pleading

tender the issue of voluntary abandonment of his contract with the School District, or did the pleading tender the issue that the parties mutually agreed to abandon the contract in suit? We think it did. Appellee went to trial on its first amended original answer. It consists of pages 10 to 19 inclusive in the transcript. Necessarily we cannot quote it. We have considered it most carefully in its entirety and our view is that such pleading is sufficient to tender the above issues. Scott v. Gardner, 137 Tex. 628, 156 S.W.2d 513, points 1 and 2, 141 A.L.R. 50, Com.Apps., op. adopted; Wisdom v. Smith, 146 Tex. 420, 209 S.W.2d 164; Ricks v. Grubbs, 147 Tex. 267, 214 S.W.2d 925; Vol. 30, Texas Digest, Pleading, ▮ Since this cause was tried without the aid of a jury we are bound by the following rule: "The rule is well settled that the judgment of a trial court will not be set aside if there is any evidence of a probative nature to support it and that a court of civil appeals cannot substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings." See Cavanaugh v. Davis, Tex.Sup., 235 S.W.2d 972, 977; Woodward v. Ortiz, Tex.Sup., 237 S.W.2d 286. See also cases collated under 4 Texas Digest, Appeal and Error, ▮ ▮

Under the above authorities and because of the error complained of, it is our duty to examine the testimony tendered to determine whether there is any evidence of probative value to support the findings of the trial court to the effect that the School District and Wilson voluntarily abandoned the contract in suit and mutually agreed to its termination. We think so.

▮ The testimony, together with the exhibits, consists of approximately 400 pages and we have examined the Statement of Facts very carefully. It is true that Wilson testified to the effect that he did not voluntarily abandon his contract with the School District and it is without dispute that the only written resignation he made was the one in his letter to the School Board tendering his resignation effective as of June 30, 1950. As we understand appellant's contention, it is that since Wilson says he did not resign and none of the

School Board testified that Wilson said he would resign, that the evidence is insufficient to sustain the trial court's finding to the effect that Wilson as well as the School Board voluntarily abandoned the contract in suit. We are not in accord with this view. It is also Wilson's view that since he did not resign (except as above stated) and did not abandon his contract, that he was fired by the School Board, and because of the fact that he was available to teach for the balance of his contract year that he is entitled as a matter of law to the balance of his unpaid salary (except his traveling expenses). We overrule this contention. Our view is that Wilson is the only witness who testified to the effect that he did not abandon his contract with the school board. If Wilson were a disinterested witness (and certainly he was not), under the record here made he could not set aside the trial court's finding to the effect that he did voluntarily abandon his contract, because of the following rule: "* * * when the evidence of an interested witness is direct and positive on the point at issue, and where there are no circumstances in the record tending to discredit or impeach his testimony, a verdict contrary thereto will be set aside, that such testimony will justify an instructed verdict, and that a judgment contrary thereto may be reversed and rendered." Dunlap v. Wright, Tex.Civ.App., 280 S.W. 276, point 6 on page 279. Are there any circumstances in the record tending to discredit or impeach Wilson's testimony? We think there are. There is also direct testimony contradicting him.

Appellant testified to the effect that at the request of the School Board he appeared before them on January 13, 1950 to answer questions concerning his announced candidacy for County Superintendent and to discuss with them whether or not he could continue under his contract as instructor of vocational agriculture. Shortly after he entered the meeting he was handed copy of Lowry's letter to the School Superintendent, to which was attached excerpts from the Hatch Act, and with reference thereto he said:

"A. After sitting and reading the letter over possibly a couple of times, I made the statement that if this was

the law, that I had been misinformed; then I was told by Mr. Hawker, I believe he did most of the talking, while I was there, it was generally understood among the board members that I could not run for a political office and hold my job there at Teague at the same time. I still replied, if it was law, I had been misinformed, that I did not intend to get out of the race; and I also stated that I had turned in all the resignation I intended to, effective at the termination of my contract. * * Then Mr. Hawker informed me it was the general consensus of opinion there at that board meeting that I could not continue as a candidate for school superintendent and retain my job as teacher at the high school.

"Q. What response did you make to that? A. I merely repeated again, if that was law, I had been misinformed, I didn't intend to quit politics.

"Q. What did you tell the board you intended to do if you couldn't do so and so? A. I said I was going to continue to run.

"Q. What was said further about it, if anything? A. About the first thing was said there then, Mr. Senter asked me if I would continue on and give mid-term examinations, I told him I would. I don't think it was ever put to a formal vote, but the board agreed and I did not ask for them to give me time to check the matter * * *

"Q. Did you proceed to investigate the authenticity of the substance of Mr. Lowery's letter, which you had read? A. I said a couple of times I had no reason in the world to doubt Mr. Lowery's position; I had that in mind when I made the statement, if this is law I had been misinformed.

"Q. Then Mr. Wilson, subsequent to that time, I believe the 13th of January this occurred, did you conduct the final examinations for your class, or that is, the examinations for that semester? A. I did.

"Q. Subsequent to that time did you deliver the keys that you had to Mr.

Gregory, the principal of the high school? A. I did.

"Q. Did you deliver to him any books or records or papers that you had in connection with the place of vocational agriculture instructor. A. I did.

"Q. Did you tell Mr. Gregory at that time that you had just neglected to check with the higher authorities before making your announcement for public office? A. No, sir, I did not.

"Q. But in fact you had neglected to talk to Mr. Lowery? A. No sir, Mr. Lowery was not in Austin at the time.

"Q. Do you know Mr. Lowery personally? A. Yes sir.

"Q. Have you talked with him a good many times on different occasions prior to this time, prior to January of 1949, I mean 1950? A. I don't think I had ever had a personal conversation with Mr. Lowery prior to that time; I had been in meetings with him.

"Q. You don't think you had any personal conversation with him prior to that time. Now Mr. Wilson, did you ever appear before the school board of the Teague Independent School District at any time after January 13, 1950? A. No sir.

"Q. Did you ever ask for permission or attempt to ask or appear before them after that time? A. No sir.

"Q. Why did you turn your keys over to Mr. Gregory? A. In January 1950, immediately following, I say immediately, I had better say following the meeting of January, I consulted with Mr. Bowlen Bond about a matter, and even contacted Mr. Olin Teague in Washington, as to getting a copy of the Hatch Act, and I was personally in Mr. Bowlen Bond's house the night he called Mr. Hawker and told Mr. Hawker that he had advised me to go back to the school house and Mr. Hawker told him that he would call the district attorney if I attempted to come back. Mr. Bond told him to go ahead he had already talked to him; with that kind

of an answer, telling me not to go up there.

"Q. That was the reason you didn't go back to the school house? A. That was it.

"Q. Did Mr. Bond you say, did he advise you not to resign from the school, Ruel? A. I don't think Mr. Bond ever made that direct statement to me.

"Q. Did you tell him that if you were fired that would be a bad mark and might interfere with future employment? A. No, sir. * * *

"Q. Subsequent to that time, about what time was it that you returned your keys or turned them over to Mr. Gregory, Ruel, was that sometime in January of 1950? A. Sir, the best I remember, that was on Monday morning after Friday 23rd of January, I think that's right.

"Q. Subsequent to that time, I believe a check, which you say you received through the mails, purporting to be signed by Mr. Hawker as president of the board of trustees of the Teague District and the secretary for a sum of money some $200.00 and something, which has a notation thereon I believe, 'final payment' or something like that on the check? A. That's right.

"Q. Did you receive that some time in January of 1950? A. I couldn't be exact on the date, the check is dated January 30th, the best I remember, maybe the next day.

"Q. At least some time in February? A. Probably so.

"Q. You have had that in your possession since that time? A. Yes, sir.

"Q. Then Mr. Wilson, what, if anything, did you do with respect to the performance of the duties of your office of employment after that time? A. Sir, I can't say that I did anything, other than the fact sir I was in Teague, Texas, I was willing and able to go back to work.

"Q. You didn't, after Mr. Bond had talked to Mr. Hawker and he said he would see about getting the district attorney, the United States District Attorney, you didn't go back to the school house or further try to carry on your work as vocational agriculture instructor? A. I didn't ask the superintendent of the school about going back, nor sir * * *

"Q. Did any member of the school board or any person ever tell you that the board of trustees of the Teague Independent School District had discharged you from your employment as vocational instructor in agriculture? A. No sir."

G. C. Gregory, principal of the high school, testified in part:

"Q. Did you have occasion to see Mr. Ruel Wilson at the Teague high school building on or about the 16th day of January, 1950? A. Yes, sir.

"Q. Where did you first see him on that date? A. I believe it was in my office. * * *

"Q. Did Mr. Wilson talk with you on that occasion or did you talk with him? A. Yes, he came to my office. * * * He told me he was quitting, and that he would go ahead and give the examinations that week, and grade the papers and make final reports. * * *

"Q. Did you have occasion to see Mr. Wilson there any more after the first occasion he talked with you and told you he was quitting? A. Yes, I saw him; I saw him every day during that week.

"Q. Did he have any further conversation with you prior to the time he concluded his examinations that you recall? A. I do not recall any further conversation than that first morning that he was there on the 16th.

"Q. Did you see Mr. Wilson any more after the conclusion of his examinations? A. Yes, he made his report to me on the following Monday, I believe January 23rd.

"Q. What, if anything, was said and done by Mr. Wilson at that time?

A. Well, he made his report, class-report. He had an office shop and class enrollment book, and he turned in the keys to the shop and the cabinet in his class room, and I believe, the key to his class room door * * *

"Q. Was there anything said about his having checked with any authorities with respect to his employment or the status of his employment? A. On the first conference, when he came to me on Monday morning the 16th, when he told me he was quitting, I asked him why. He said, 'As you know, I am running for County Superintendent, and I thought I had everything arranged, but it seems now I did not check with the high authorities on that.' That was on Monday, the first time he came to see me. * * *

"Q. Did you see Mr. Wilson any more after that time at the school building engaged in the teaching of the vocational agriculture class, after he turned in his keys? A. No."

J. E. Wells, who succeeded Wilson as vocational agricultural instructor, testified in part as follows:

"Q. Did you ever have any discussion, or did Mr. Ruel Wilson ever say anything to you about the position of vocational agriculture instructor in which he was employed by the Teague Independent School District? A. You mean before I was employed?

"Q. Yes. A. Yes, sir.

"Q. What, if anything, did he say, and where was it? A. It was on the school grounds, and he informed me he was out of the job and position, and it was open.

"Q. Do you now recall if there was anything else said at that time about it by him or by you while he was present? A. Not anything in detail or in particular, sir, except he informed me that he was out and the job was open, and I was welcome to make application. * * *

"Q. Prior to your employment by the Teague Independent School District, did you have any occasion to discuss the matter with him any more? A. Two or three more. One day was Bill Boyd Day over there. My wife was with me; we were on the grounds and it was just prior to the parade, and he told me the same thing I have already repeated.

"Q. That was prior to February 6th? A. Yes, sir."

Appellant in his brief says: " * * * the facts are conclusive that he (referring to Wilson) was given his choice of quitting or not running, and that from that time on, the School Board considered that he was no longer their employee * * *." We think that this is the effect of the finding of the trial court, and that such finding of the trial court is based on the inference that the court drew from all the facts and circumstances before him that Wilson chose to quit·his job and run for the office of County Superintendent. There is no doubt that when appellant appeared before the School Board at their request that the Board was of the opinion that appellant could not run for the office of County Superintendent and continue to discharge his duties as Vocational Agricultural instructor, and Wilson told them in effect that he had been misinformed if he could not hold his job and run for office and then stated that he was going to run. But appellant says further in his argument: " * * * the statement of the Board members * * * and * * * the actions of the school principal and certainly the actions above enumerated on behalf of the plaintiff (appellant) in no wise was the action of a man who has agreed to terminate his contract * * *." The trial court saw and heard the witnesses and took a contrary view. Our view is that the trial court had the right to infer from the testimony tendered and the facts and circumstances surrounding the parties that the Board was of the view at that meeting that appellant was quitting; otherwise, there would have been no occasion for the Board to request him to continue on and give the examinations for that semester, and that if appellant had not intended to quit he would have told the Board so at the meeting and he would not

have told the principal that he was quitting when he went back to give the examinations, and would have gone back to the Board or to the principal or superintendent and tendered his services and demanded that he be allowed to fulfill his contract.

It is our view, after considering the testimony in its entirety, that it is ample to sustain the trial court's finding to the effect that Wilson and the Teague School District did voluntarily abandon the contract and that such contract was terminated by agreement.

Since we are of the foregoing view, it necessarily follows that all other questions pass out of the case and the judgment of the trial court must be affirmed.

The judgment of the trial court is affirmed.

LESTER, C. J., took no part in the consideration and disposition of this case.