**J. Lloyd PATTON et al., Appellants,**

**v.**

**U. E. ROGERS et ux., Appellees.**

**No. 14579.**

Court of Civil Appeals of Texas.

San Antonio.

June 28, 1967.

Rehearing Denied July 26, 1967.

---

Stone, Tilley, Parker, Snakard, Law & Brown, Thos. H. Law, Sam Denny, Elton M. Hyder, Jr., Fort Worth, for appellants.

Runge, Marschall, Hall & McLaughlin, William I. Marschall, Jr., San Angelo, for appellees.

KLINGEMAN, Justice.

Suit by plaintiffs, U. E. Rogers and wife, Mary Evelyn Rogers, to cancel an oil, gas and mineral lease, dated March 24, 1962, executed by plaintiffs in favor of J. Lloyd Patton as lessee, covering a tract of approximately 999 acres in Menard County, Texas. The trial court, sitting without a jury, decreed that said lease "is declared to have terminated in accordance with its own terms and provisions on December 28, 1965," but further ordered that defendants had the right to remove all personal property, including casing, from the lease. No findings of fact or conclusions of law were requested or filed by the trial court. From the judgment cancelling the lease, defendants, J. Lloyd Patton et al., have appealed, and plaintiffs, U. E. Rogers et ux., have appealed from that portion of the judgment authorizing the defendants to draw and remove the casing and other fixtures from the gas well on said land.

The lease in controversy was one of several executed by Rogers to Patton, and was known and identified as the Rogers "C" lease. Such lease was for a primary term commencing on March 24, 1962, the date of such lease, and ending on December 28, 1963, "and so long thereafter as oil, gas or other mineral is produced from said land." It contains a customary shut-in royalty provision that where gas is not being sold or used, leasee may pay as royalty $50.00 per well per year; however, said lease also contains an attached rider providing, among other things, that notwithstanding anything in the lease to the contrary such lease could not be maintained in force solely by the payment of shut-in royalty for a period in excess of two years beyond the expiration of the primary term thereof. In August of 1963, a gas well was completed on the "C" lease, but was shut-in due to lack of a market. Although Patton was the operator of the "C" lease, he had assigned some of the working interest in such lease to the other defendants. No other wells were completed on such lease. Patton was also the operator and owned interest in the Rogers "D" lease, on which there was a producing oil well.

In a nonjury case where no findings of fact or conclusions of law are filed by the trial judge, the judgment should be affirmed if there is evidence to support it on any theory of the case. City of Abilene v. Meek, Tex.Civ.App., 311 S.W.2d 654, writ ref'd; Western Woods Products Co. v. Bagley, 274 S.W.2d 111, writ ref'd n. r. e.; 4 Tex.Jur.2d, Appeal and Error, § 747 (1959). In cases tried before the court without a jury, in the absence of a point that the judgment is contrary to the overwhelming weight and preponderance of the evidence, the rule is well settled that the judgment must be affirmed if there is any evidence of probative value to support it, and that only evidence which tends to support the judgment may be considered. Holley v. Painters Local Union No. 318, 376 S.W.2d 44, 46, writ ref'd n. r. e.; Frazier v. Williams, Tex.Civ.App., 359 S.W.2d 213, no writ. See also Wilson v. Teague Ind. School Dist., Tex.Civ.App., 251 S.W.2d 263, writ ref'd, and Calvert, "No Evidence and Insufficient Evidence Points of Error," 38 Texas L.Rev. 361 (1961).

Defendants' first point of error is that the trial court erred in rendering judgment terminating the "C" lease, since a bona fide commercial market for gas produced from the "C" lease existed on December 28, 1965.

It appears from the evidence that Patton had made various efforts to obtain a market for the gas, without success, but that in 1965 he was negotiating with Sinclair Oil & Gas Company and a market was promised. The signed gas purchase contract introduced in evidence bears the date of January 17, 1966. On December 22, 1965, six days before such lease would terminate in the absence of such production as would hold the lease, Patton ran a ½ inch pipe line from the gas well on the "C" lease to a producing oil well on the "D" lease, which said gas line was connected to a gas engine and a "heater-treater" which Patton had just installed on the "D" lease. This oil well had previously been pumped by an electric engine which Patton removed at this time. Patton maintains that he was having trouble with the oil being produced from such "D" well because of excessive emulsion and water in the oil, and that the device installed, which was sometimes referred to as a flow-line heater, was a device commonly employed to remove water and emulsion from oil. Patton testified that it was agreed between the owners of the "C" lease and the owners of the "D" lease that the owners of the "C" lease would be paid on a basis of 16 cents per M.C.F. for all gas taken from the "C" lease and used on the "D" lease, and that there would be a guaranteed minimum royalty payment of $100.00 a month for the gas taken. The working interest owners of the "C" lease and the "D" lease are identical, except for some small interest of which there is not common ownership.

Rogers contends that the implied findings of the trial court that there was not a bona fide commercial market is supported by the following evidence: (a) The nearest gas pipe line was approximately 9 miles away from the well, and the nearest town approximately 20 miles; (b) the agreed price of 16 cents per M.C.F. is almost twice the price of the nearest gas sales, and Patton himself testified that 10½ cents per M.C.F. was a fair market value; (c) such gas purchase for the operation of the "D" lease oil well increased the fuel cost to $1.54 per barrel for each barrel of oil produced, and it actually made the operation of such "D" lease well unprofitable; (d) Patton himself admitted that a good faith operator could not afford to pay $1.54 per barrel for fuel; (e) the production from such oil well decreased from an average of about 80 barrels per month to an average of about 60 barrels per month, following the change to the gas engine; (f) plaintiffs' expert witness testified that the so-called "heater-treater" was nothing more than a "sophisticated flare," that such heater could not separate the oil from the water, and that he could not see any useful purpose of such heater on such lease; (g) testimony to the effect that such heater-treater was not even lighted from shortly after its installation until after the suit was filed, a period of approximately three months, which testimony was disputed; (h) the oil produced from such oil well had previously been treated for this condition by a chemical method at a much lower cost than the gas-heat treatment; the average total monthly fuel or power cost for such oil well before the change to gas was about $12.76 a month, and after the gas "purchase" agreement such cost was many times that amount; (i) no real standard was used in arriving at the $100.00 per month minimum payment, except that Patton testified he "figured it would be more than fair," and on the amount of gas used, according to metering, the price being paid under such minimum payment was almost 70 cents per M.C.F. in an area where the actual sales were at a price of less than 10 cents per M.C.F.; (j) no gas pipe line was being built to the lease on December 28, 1965, and on such date Sinclair didn't have a gas line within nine miles of the "C" lease well.

While much of the evidence is conflicting, the trial court's implied finding of lack of a bona fide market is sufficiently supported by evidence in the record and defendants' "Point One" is overruled.

■ Defendants' "Point Two" is that the trial court erred in terminating the lease since on December 28, 1965, Patton was operating the lease in the manner in which a prudent operator would operate under the circumstances.

■ Defendants assert, and we agree, that the law is well settled that even if a finding of no production in paying quantities is sustainable, in order to terminate the lease, there must also be a finding that a reasonably prudent operator would not have continued to operate the lease under the circumstances. Skelly Oil Co. v. Archer, 163 Tex. 336, 356 S.W.2d 774 (1962); Clifton v. Koontz, 160 Tex. 82, 325 S.W.2d 684 (1959); Ballanfonte v. Kimbell, Tex.Civ. App., 373 S.W.2d 119, writ ref'd n. r. e. However, many of defendants' contentions in this regard support the proposition that a reasonably prudent operator under the circumstances would attempt to hold or save the lease, and defendants assert that the testimony is uncontroverted that a prudent operator having a signed contract with a major oil company would attempt to hold or save the lease. This is not the test set forth by the Courts in the above cited cases. Our Supreme Court in Clifton v. Koontz, supra, held that in the case of a marginal well the standard by which paying quantities is determined is whether or not, under all relevant circumstances, a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which it was operated. In Skelly Oil Co. v. Archer, supra, the Supreme Court held that if the evidence established, as a matter of law, that Skelly was not making a profit from the well or if there is a fact finding, supported by evidence, to that effect, the lease should not yet terminate unless the evidence established as a matter of law, or lessor obtained a fact finding supported by evidence, that a reasonably prudent operator would not have continued to operate the well under the circumstances.

Rogers, after testifying that he was an operator of oil and gas wells, testified unqualifiedly that he would not attempt to continue to operate a well under the circumstances that existed. J. V. Northington, Jr., an oil operator, in answer to hypothetical questions assuming that the income was 16 cents per M.C.F. run through the line and that the gross income was assumed to equal $100.00 per month, whether or not a reasonably prudent operator would continue to operate the gas well for the purpose of making a profit and not for speculation, stated that he would not.

Although there is testimony to the effect that a reasonably prudent operator would have continued to operate the well under the circumstances existing, there is also testimony to the contrary, and, giving credit to all evidence favorable to the findings and judgment of the court, the trier of the facts, we have reached the conclusion that there is evidence of probative force supporting the implied findings of the court, and defendants' "Point Two" is overruled. Clifton v. Koontz, supra; Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286 (1951).

■ Defendants' "Point Three" is that the trial court erred in rendering judgment cancelling the "C" lease since it was producing gas in paying quantities on December 28, 1965.

■ The term "paying quantities" means that the income to the lessee must be sufficient to pay the lessee a profit, though small, over operating and marketing expenses, although it may never repay the cost of drilling a well. Skelly Oil Co. v. Archer, supra; Garcia v. King, 139 Tex. 578, 164 S.W.2d 509 (1942).

The evidence as to whether there was production in paying quantities is conflicting. Defendants' accountant testified

that on a gross income of $100.00 per month, the minimum monthly payment for the sale of gas from the "C" lease to the "D" lease, according to his method of calculating allowable expenses, such well showed a gross profit of $255.85 for a six-month period, or $40.94 a month. Plaintiffs attack this contention on two grounds: (1) That such amount of $100.00 per month was not a bona fide sale, and did not represent an arm's-length business transaction, but was merely an instance of where the working interest owners of the "C" lease and the "D" lease, whose interests were identical except for a small interest, got together and set a sale price solely for the purpose of showing that the "C" lease was operating at a profit; (2) that the method of allocation of expenses used by defendants' accountant did not take in account many items of expense properly chargeable to such well, and if such items are considered the well was not producing in paying quantities even at such figure of $100.00 per month income.

■ In order that there be production in paying quantities, there must be an available market. Gulf Oil Corp. v. Reid, 161 Tex. 51, 337 S.W.2d 267 (1960); Garcia v. King, supra. In the Reid case, the Supreme Court said: "Thus, no matter how great the potential production may be or how many million cubic feet of gas may have been flared, there would be no production or production in paying quantities unless there was an available market; * * *." Since the court impliedly found that there was not a bona fide commercial market (Defendants' Point One), under such holding defendants' contention that there was production in paying quantities can not be sustained.

Plaintiffs assert that, including all of the gas flared, vented or in any manner run from the "C" well at the "agreed" sale price of 16 cents per M.C.F., according to the evidence, the largest amount of gas metered from such runs in any one month would produce a gross income of $25.93 a month, which would be less than the average monthly expense allocable to the "C" well according to defendants' own accountant, to-wit, more than $36.00 a month. Plaintiffs further assert, assuming "arguendo" that the figure of $100.00 per month can be considered as a bona fide production, that after taking off the landowner royalty and the severance tax, the gross income for the working interest would be $75.56 a month, and, according to plaintiffs' method of allocating expenses, the monthly expense would exceed this amount.

The testimony is conflicting as to the expense properly allocable to such well, and this matter is complicated by the fact that Patton operated approximately twenty wells in this immediate area. Plaintiffs contend that a "per well" allocation of expenses would be fair, and there is evidence in the record of per well charges in excess of $100.00 per well in this area. Defendants admit that some of the expenses allocated to the well were on a "per well" basis, and defendants' allocation of expenses appears to be a combination of expenses that are directly attributable to the well, and some items, such as telephone calls, were allocated on a per well area basis. There was testimony by Patton himself that he made an average of four or five calls a month at an average cost of around $6.00 to $7.00 a call in connection with the "C" lease. In addition, certain items of expense, such as road lease expense, certain employees expense and other expenses, which plaintiffs contended were directly attributable to overhead expenses of operating the well, were not included in defendants accountant's expenses. There was also a conflict as to the proper amount of depreciation chargeable to such well. Plaintiffs contend, and there is evidence to support it, that if plaintiffs' method of allocating expenses is accepted, the overhead and telephone expenses alone attributable to the lease, would exceed the $75.56 gross income from the well under the "assumed" sale at $100.00 per month.

■ The matter of allocation and calculation of expenses is a fact question. Sullivan and Garnett v. James, Tex.Civ. App., 308 S.W.2d 891, writ ref'd n.r.e. The question of whether there is production in paying quantities is a question of fact for the jury. Bain v. Strance, Tex.Civ.App., 256 S.W.2d 208, writ ref'd n. r. e.; Sullivan and Garnett v. James, supra. The trial court having considered all the testimony as to conflicting theories and methods of calculation and as to the various items of income and expense, impliedly found that there was no production in paying quantities. The evidence, though conflicting, is sufficient to support the trial court's finding.

Defendants' Points of Error Four and Five involve a construction of the same rider attached to the "C" lease, and such points will be discussed together.

Point Four is: "The trial court erred in rendering judgment terminating the 'C' lease since on December 28, 1965, gas was being 'sold or used' from the 'C' lease."

Point Five is: "The trial court erred in cancelling the entire 'C' lease since a tender of shut-in royalty was made sufficient to keep the 40 acres around the 'C–1' well even if the rest of the lease terminated."

The "C" lease contains a customary shut-in well provision providing for the payment of shut-in royalty of $50.00 per well per year, and also contains the following provision in an attached rider:

"Anything contained herein to the contrary notwithstanding, it is understood and agreed that this lease as to its entirety cannot be maintained in force solely by the payment of shut-in gas royalty for a period in excess of two (2) years beyond the expiration of the primary term hereof; however, if at the expiration of said two-year period, there is located on the above described land a well or wells capable of producing gas only (or gas and distillate only) and such gas is not sold or used, the Lessee herein may pay as royalty $40.00 per well per year and immediately release as to the Lessors, their heirs or assigns, all remaining acreage, save and except forty (40) acres in as nearly the form of a square as possible around such shut-in gas well, and upon such payment it will be considered that gas is being produced within the meaning of paragraph 2 above insofar and only insofar as the shut-in gas well or wells and the 40-acre drill-site surrounding same is concerned."

Defendants paid $50.00 shut-in royalty in August of 1962, 1963, 1964 and 1965. They also tendered $50.00 shut-in royalty in November, 1965, but such tendered payment was returned by plaintiffs.

■ It is defendants' contention, under Point Four, that the testimony shows that some gas was being sold and used on December 28, 1965, and that even if it is assumed that it was not in paying quantities lessees' tender of the $50.00 shut-in payment, when taken together with the sale and use of such gas, was sufficient to hold such lease in its entirety. They contend that "solely" as used in such rider means only that such lease cannot be maintained beyond the two-year limitation period solely by the payment of the shut-in royalty; that if there is sale or use of any gas, whether or not in paying quantities, this is sufficient to maintain said lease in its entirety if such $50.00 payment is made. Plaintiffs' position is that such provision is an absolute limitation upon how long such lease can be maintained in its entirety by shut-in gas well payments, and that while such lease could be maintained in effect after such two-year limitation period by other means authorized in the lease, it could not be maintained in its entirety beyond the two-year limitation period by the payment of the $50.00 shut-in royalty. They further contend that the $50.00 shut-in royalty applies only to the situation where gas is not sold or used from the well producing gas only, and that lessees cannot take the position that gas was being sold and used, and still

rely on such shut-in provision to preserve the lease. It is our opinion that such provision limits the period of time to which such lease can be maintained in its entirety by the $50.00 shut-in payment, to a period of two years beyond the expiration of the primary term. Defendants' Point Four is overruled.

In support of their Point Five, defendants maintain that because a tender of $50.00 shut-in royalty was made, since this was in excess of the $40.00 payment required in such rider to maintain the lease as to 40 acres around the "C" well, if it did not maintain the lease as to its entirety, that such tender was effective to maintain the lease as to 40 acres around the "C" lease. The applicable provisions of the rider in this connection are that if, at the expiration of such two-year limitation period, there is a well capable of producing gas, and such gas is not sold or used, the lessee may pay as royalty $40.00 per well per year and immediately release to lessor all remaining acreage except the 40 acres around the well, and such lease would be maintained as to such 40 acres.

■■■ The tendered $50.00 shut-in royalty check was introduced in evidence. Such check is dated Nov. 18, 1965, and contains this notation: "Shut-in gas royalty—U. E. Rogers 'C' #1." No release as to the remaining acreage was tendered at that time or at any time. We do not believe this is such a tender as would preserve the 40 acres. In general, a rental clause requires strict and timely performance, and an error in the amount or date is fatal. 42 Tex.Jur.2d, Oil & Gas, §§ 220, 223 (1963). Defendants' tender in no way ties in or identifies itself with the provision in the rider as to the payment of $40.00, it being different in amount, and being the amount provided in the printed portion of the lease for shut-in payments to maintain the lease in its entirety. Neither did lessees offer the release provided for in the rider, and while we do not pass on whether this in itself is fatal, it is some evidence that such tender

was for the preservation of the entire lease. Such tender was not in accordance with the applicable provisions of the rider for maintaining the lease as to 40 acres around a well where gas is not sold or used. Defendants' Point Five is overruled.

■■■ Plaintiffs appeal from that portion of the judgment authorizing the defendants to draw and remove the casing and fixtures from the gas well located on the "C" lease, and present two points of error: "*POINT I*. The District Court erred in authorizing the Defendants to draw and remove the casing and other fixtures from this gas well because the Defendants do not have the right to ruin or destroy a productive well by taking away such fixtures. *POINT II*. The District Court erred in failing to vest title to the casing and other fixtures in the gas well in the Plaintiffs upon their depositing the reasonable value of such fixtures (after deducting the cost of pulling, plugging and non-recoverable casing) into the registry of the trial court."

The lease in question contained this provision: "Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing." The evidence appears undisputed that the removal of such casing would destroy the well. There is evidence in the record that such well was originally potentialed for 46 million cubic feet of gas per day, and later repotentialed for 12 million cubic feet of gas per day.

■■■ There is ample authority in Texas supporting the proposition that the owner of the casing does not have the right to ruin or destroy a productive well by taking away the casing. The holdings in these cases seem to be predicated on a theory of public policy of preventing waste of our natural resources. One of the earliest decisions in this regard was by this Court in Wisconsin-Texas Oil Co. v. Clutter, Tex.Civ.App., 258

S.W. 265, rev'd on other grounds, 268 S.W. 921 (Tex.Comm'n App. 1925), in which the Court held that while casing may be removed from a dry hole, an owner has no right to remove casing from a producing oil and gas well. The Court further stated that to permit such removal would mean to defy the law against waste in oil and gas production. A late decision on this matter is the case of Eubank v. Twin Mountain Oil Corp., Tex.Civ.App., 406 S.W.2d 789, writ ref'd n. r. e., where the Court held that under appropriate provisions in an oil and gas lease casing may be removed before or after the expiration of a lease from a non-productive hole, but that the owner does not have the right to ruin or destroy a producing well by taking away the casing. Other cases supporting this proposition are: Woodson Oil Co. v. Pruett, Tex.Civ.App., 298 S.W.2d 856, writ ref'd n. r. e.; Meers v. Frick-Reid Supply Corp., Tex.Civ.App., 127 S.W.2d 493, writ ref'd judgmt cor.; Orfic Gasoline Production Co. v. Herring, Tex.Civ.App., 273 S.W. 944, no writ. Defendants cite the case of Cox v. Miller, Tex.Civ.App., 184 S.W.2d 323, writ ref'd, as supporting their contention that the court properly authorized the defendants to draw and remove the casing and other fixtures from the "C" gas well for the reason that such right was given to them under the lease. The Court in the Cox case, which involved a gas well capable of producing gas, held that the owner had a right to draw and remove the casing, but it is interesting to note that the judgment in that case provided that the plaintiff could keep the casing by paying to the owner of such casing $2,585.00, the value of the pipe in the well, which judgment of the trial court was affirmed by the Court of Civil Appeals. That case did not discuss the matter of public interest in preventing waste of our natural resources.

Defendants contend that none of the cases relied on by plaintiffs involved a situation where the lessor successfully obtained a finding of no production in paying quantities and in the same case was able to prohibit the pulling of the casing on the ground that the well was a producing well. However, the Court in the late case of Eubank v. Twin Mountain Oil Corp., supra, held that a lessee was properly denied the right to remove the casing he owned from three wells which were reasonably capable of producing and probably would produce in paying quantities. There are many cases where leases have been terminated by reason of failure to comply with some of the provisions of limitations in the lease, wherein there were wells involved with large production capabilities, as in Gulf Oil Corp. v. Reid, supra (failure to timely make a shut-in royalty payment), and Stanolind Oil & Gas Co. v. Barnhill, Tex.Civ.App., 107 S.W.2d 746, writ ref'd (lack of market). The decisions by the Courts hereinbefore cited prohibiting the pulling and removing of casing appear to be principally based on a matter of public policy to prevent waste and preserve our natural resources and, in, our opinion, such policy would cover and include such wells as were involved in the Reid case, the Barnhill case, and the case before us. Plaintiffs' "POINT I" is sustained.

In support of their "POINT II" plaintiffs rely on the case of Eubank v. Twin Mountain Oil Corp., supra, where the Court, after denying the right of the owner (defendant) to remove the casing from three wells reasonably capable of producing, vested title to the casing in plaintiff upon his depositing the sum of $1,800.00 in the registry of the court, which sum was the reasonable value of the removable casing after deducting the cost of pulling and plugging. Plaintiffs ask this Court to reverse that portion of the judgment authorizing defendants to remove the casing and other fixtures from the gas well, and render judgment awarding title to such casing and fixtures to plaintiffs upon their depositing into the registry of the trial court the reasonable value of such casing and other fixtures, after deducting the cost of pulling and plugging and non-recoverable casing. The testimony shows the reasonable

market value of the casing and other fixtures at the time of trial to be $2,465.00, without considering the cost of recovering such equipment or plugging the well. The only testimony in the record as to the reasonable market value of the casing and fixtures after deducting the costs of pulling, plugging and non-recoverable casing was by one of defendants' witnesses who testified that after considering these items one would be lucky to come out with a few hundred bucks, and could come out with a minus figure. Under the state of the testimony, we do not see how this Court could determine the reasonable market value after deducting such costs.

The judgment of the trial court cancelling said oil, gas and mineral lease is affirmed and severed from said cause, but that portion of said judgment authorizing the defendants to draw and remove the casing and other fixtures is reversed and the cause remanded to the trial court for further proceedings not inconsistent with this opinion. All · costs are taxed against defendants.