Arthur MITCHELL, Trustee, Appellant,

v.

MESA PETROLEUM COMPANY,
Appellee.

No. 16222.

Court of Civil Appeals of Texas,
San Antonio.

Dec. 12, 1979.

Rehearing Denied Jan. 23, 1980.

Robert Miller, Dallas, John F. Ryan, Austin, for appellant.

D. D. Dent, Barry F. Cannaday, Thomas H. Hawkins, Amarillo, for appellee.

## OPINION

KLINGEMAN, Justice.

This is a trespass to try title suit. Appellant, Arthur Mitchell, Trustee (plaintiff below), contends that he has a superior legal title to the oil and gas leasehold estate under Tract "A" of the La Moca Ranch field, and Appellee, Mesa Petroleum Company (defendant below), contends that it has legal title to such oil and gas. The court after a non-jury trial entered judgment that Mitchell take nothing by his suit. No findings of fact or conclusions of law were requested of or filed by the trial court. Appellant will normally hereinafter be referred to as "Mitchell" and Appellee as "Mesa."

By six points of error, Mitchell asserts that the trial court erred in ruling that he take nothing because (1) he established good title in himself; (2) his oil and gas lease is valid; (3) his title is superior to Mesa's; (4) Mesa was a bad faith trespasser; (5) Mitchell had standing to challenge Mesa's lease; and (6) the Veterans' Land Board of Texas had the power to cancel Mesa's lease. By counterpoints, Mesa as-

serts that the trial court correctly held that Mitchell take nothing because (1) Mitchell did not establish a good title in himself; (2) Mitchell's lease, even if executed by the proper party, is not in force and effect; (3) Mesa's title is superior to Mitchell's; (4) Mitchell had no standing to challenge Mesa's lease; and (5) the Veterans' Land Board did not cancel Mesa's lease.

■■ In a trespass to try title suit the plaintiff is required to .affirmatively establish his title. *Land v. Turner*, 377 S.W.2d 181 (Tex.1964); *Hejl v. Wirth*, 161 Tex. 609, 343 S.W.2d 226 (1961); *Doria v. Suchowolski*, 531 S.W.2d 360 (Tex.Civ.App.—San Antonio 1975, writ ref'd n. r. e.). Plaintiff must recover on the strength of his own title and not on the weakness of his opponent's title. *Adams v. Rowles*, 149 Tex. 52, 228 S.W.2d 849 (1950); *Trevino v. Munoz*, 583 S.W.2d 840 (Tex.Civ.App.—San Antonio 1979, no writ); *Gillum v. Temple*, 546 S.W.2d 361 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.); *Stark v. Stefka*, 491 S.W.2d 757 (Tex.Civ.App.—Austin 1973, no writ); *Perkins v. Smith*, 476 S.W.2d 902 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n. r. e.). If plaintiff fails to affirmatively establish his title, judgment must be entered for defendant and there is no necessity for determining whether defendant had title to his property. *Hejl v. Wirth*, 161 Tex. 609, 343 S.W.2d 226 (1961); *Gillum v. Temple*, 546 S.W.2d 361, 365 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.).

■ A plaintiff can establish his title by any one of four different methods: (1) title emanating from the sovereignty of the soil to plaintiff; (2) a superior title in plaintiff emanating from a common source to which the defendant claims; (3) adverse possession; or (4) prior possession at a time which antedates defendant's possession of the land. *Land v. Turner*, 377 S.W.2d 181, 183 (Tex.1964); *Gillum v. Temple*, 546 S.W.2d 361, 363 (Tex.Civ.App.—Corpus Christi

1977, writ ref'd n. r. e.); *French v. May*, 484 S.W.2d 420, 427 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n. r. e.).

■ No findings of fact or conclusions of law were requested of or filed by the trial court. We must presume that the trial court found every fact necessary to sustain the judgment if such fact is raised by the pleadings and supported by the evidence. *Renfro Drug Co. v. Lewis*, 149 Tex. 507, 235 S.W.2d 609, 613 (1950); *Plata v. Guzman*, 571 S.W.2d 408, 410 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n. r. e.). If there is any legal theory supported by the evidence that will support the judgment of the trial court the judgment must be affirmed. *Seaman v. Seaman*, 425 S.W.2d 339, 341 (Tex. 1968). In considering the sufficiency of the evidence in support of the trial court's findings, the appellate court must construe the evidence in the light most favorablᴊ to the judgment and make every legitimate conclusion which tends to uphold the judgment. *Bishop v. Bishop*, 359 S.W.2d 869, 871 (Tex. 1962). Any fact impliedly found by the trial judge must be accepted on appeal if there is any evidence of probative value to support it. *Seaman v. Seaman*, 425 S.W.2d 339 (Tex.1968); *Patton v. Rogers*, 417 S.W.2d 470 (Tex.Civ.App.—San Antonio 1967, writ ref'd n. r. e.).[1]

Mitchell asserts that he proved a superior title emanating from a common source.[2] Mesa on the other hand contends that Mitchell wholly failed to establish that he had a superior title to the oil and gas leasehold rights on Tract "A" emanating from a common source or otherwise.[3]

The chain of title relied on by Mitchell is (a) a warranty deed from the Rio Grande Corporation to the Veterans' Land Board of Texas dated June 15, 1954, (b) a surface and recreation lease from the Veterans' Land Board to La Moca Club, Inc., dated July 10, 1954, and (c) an oil and gas lease from La Moca Club, Inc., to Arthur Mitchell, Trus-

---

1. Mitchell has no point of error challenging the trial court's sufficiency of the evidence to support any finding of fact impliedly made.

2. Mitchell made no attempt to establish title by the other three methods set out above.

3. Tract "B" is not involved in this lawsuit.

tee, dated May 1, 1976. Mesa's chain of title is as follows: (1) the warranty deed from Rio Grande Corporation to Veterans' Land Board dated June 15, 1954; and (2) an oil and gas lease from the Veterans' Land Board to Mesa, dated September 11, 1972.[4]

An examination of the instruments relied on by the parties hereto shows:

(1) The warranty deed from Rio Grande Corporation to Veterans' Land Board relied on by both parties conveys the land here involved to the Veterans' Land Board, including the oil, gas and mineral rights, with no restrictions as to power of leasing;

(2) The surface and recreation lease from the Veterans' Land Board to La Moca Club, Inc., of Tracts "A" and "B" is for a limited term of years for utilization of and providing facilities thereon for hunting, fishing and other recreational purposes to be used by the 77 veterans who are purchasing tracts of land under the Veterans' Land Board program;

(3) The oil and gas lease from the Veterans' Land Board, Lessor, to Mesa Petroleum Company is dated September 11, 1972, covering Tract "A" on the Veterans' Land Board form lease for a term of five years and so long thereafter as there is production and providing for annual delay rental of $157.10; and

(4) The oil and gas lease from La Moca Club, Inc., Lessor, to Arthur Mitchell, Trustee, is dated May 1, 1976, containing an approval by Bob Armstrong, Chairman of the Veterans' Land Board, for a primary term of two years and providing an annual delay rental of $314.20.

It is undisputed that Mesa commenced a well on the leased premises on April 30, 1977, during the primary term of the lease. It was completed as a gas well and was thereafter shut-in during the primary term. A shut-in royalty payment was timely made in accordance with the terms and provisions of the lease. This well is presently producing.

Mitchell's bases for his contention that he has a valid oil and gas lease on the premises involved may be summarized as follows:

(a) The Veterans' Land Board does not own the mineral rights in Tract "A", and they are merely the leasing agent for the veterans;

(b) La Moca Club, Inc., as lessor in the oil and gas lease, was acting as agent for the various veterans and this lease was approved by the Veterans' Land Board; and

(c) Mesa's lease had in some manner expired or been terminated.

In support of his contention that the Veterans' Land Board does not own the minerals under Tract "A" and is merely acting as agent of some 77 veterans, Mitchell relies on one deed which he introduced into evidence, to wit, a deed dated March 6, 1974, from the Veterans' Land Board to Rudy Santos, of Tract No. 56 of the subdivision of the La Moca Ranch, containing 142.85 acres. This deed recites that Santos has fully complied with the terms and provisions of a contract of sale between Santos and the Veterans' Land Board dated February 18, 1960, and paid off the entire indebtedness under the contract.

■ There are numerous problems in Mitchell's contentions. One basic problem is that, although Mitchell contends that the Veterans' Land Board does not own the minerals in Tract "A" but is merely agent for 77 veterans, he has seen fit to introduce into the record only one deed to any of these veterans. Insofar as this record is concerned, there is no proof of title whatsoever as to any of the other veterans. The deed to Santos does convey some type of mineral interest in Tract "A" to him, subject to certain specific conditions set forth in his deed, one of these conditions being the full and final payment of all indebtedness by all of the veterans on all involved tracts and providing that, upon this occurrence, the Veterans' Land Board will con-

---

4.  In this trespass to try title suit it was not incumbent upon Mesa to prove its chain of title.

vey Tracts "A" and "B" to the veterans who have fully complied with all of the terms and conditions of their respective contracts of sale and purchase. However, the record contains no Veterans' Land Board Contracts of Sale and Purchase and no deeds of conveyance to any of these veterans other than the Santos deed. Proof that one veteran has a deed of conveyance to one tract out of an unnamed group of veterans is not proof that 76 other veterans have either contracts of sale or deeds, or have acquired any title of interest in the La Moca Ranch. As the record stands before us, the Veterans' Land Board is still the owner of the other tracts including the oil, gas and mineral interest and leasing power to Tracts "A" and "B." Since Mitchell failed to introduce any other deeds into evidence, except the Santos deed, he did not prove his chain of title.

The very instrument relied on by Mitchell (the Santos deed) shows that (a) deeds of conveyance involving the oil, gas and mineral interests in Tracts "A" and "B" will only be given to a veteran who has fully complied with his contract and made all payments thereon and only upon full and final payment of all indebtedness on all of the other tracts involved deeds of .conveyance to interest in Tracts "A" and "B" will be given; and (b) the veteran purchaser designates and appoints the Veterans' Land Board as his *sole and exclusive* agent to sell, convey and lease Tracts "A" and "B" for oil, gas and mineral development and that such agency is exclusive and shall not be revoked until the indebtedness due the Veterans' Land Board on all of the veterans' tracts involved has been completely satisfied.

Although Mitchell admits that La Moca Club, Inc., has no power and authority under its recreational lease to execute oil and gas leases on Tracts "A" and "B", he contends that La Moca Club, Inc., is also a type of agent or representative of the unnamed veterans (assuming there are some other veterans) to lease said tract for oil and gas. There is no proof of such agency in the record neither through the recreational lease involved or otherwise. In fact, any

such purported agency flies in the face of the very instrument introduced and relied on by Mitchell (the Santos deed). It provides that the Veterans' Land Board is the sole and exclusive agent to lease Tracts "A" and "B" until all veterans involved have paid off in full all indebtedness due under any contract involved.

Under the record before us, Mitchell has wholly failed to meet the burden imposed upon him as plaintiff in a trespass to try title suit to establish that he had a valid and subsisting oil and gas lease on Tract "A".

Assuming arguendo that Mitchell acquired some type of oil and gas lease on said tract under the oil and gas lease under which he claims, such lease would be inferior and subordinate to the Mesa lease, unless the Mesa lease has terminated or expired for some reason.

The record establishes that Mesa timely paid all required delay rentals under said lease; that prior to the end of the primary term of such lease, it completed a gas well which was shut-in; and that the required shut-in royalty payment was timely made. Mitchell does not dispute any of these facts but asserts that (a) the Mesa lease was terminated for failure to timely pay compensatory royalty provided for in the lease and (b) the Veterans' Land Board terminated the Mesa lease by approving his lease.

The applicable royalty shut-in provision contained in the Mesa lease at paragraph 19 reads as follows:

If at the expiration of the primary term, or at any time thereafter, there is located on the herein leased premises a well or wells capable of producing gas in paying quantities, and the lease is not being otherwise maintained in force and effect, the Lessee may pay as royalty a sum of money equal to double the annual rental . . . .. Such payment is to be made prior to the expiration of the primary term hereof, . . . ; and if such payment is made, this lease shall be considered to be a producing lease *and such shut-in gas royalty payment shall extend*

*the term of this lease for a period of one (1) year from the end of the primary term . . . ;* and thereafter, the Lessee may extend this lease for four (4) additional and successive periods of one (1) year each by the payment of a like sum of money each year on or before the expiration of the extended term. Provided, however, that if while such lease is being maintained in force and effect by payment of such shut-in gas well royalty gas should be sold and delivered in paying quantities from a well situated within one thousand (1,000) feet of the leased premises and completed in the same producing reservoir, or in any case where drainage is occurring, the right to *further* extend this lease by shut-in gas royalty payments shall cease *but the lease will remain in force and effect for the remainder of the current one (1) year period for which the shut-in gas well royalty has been paid,* . . .. (Emphasis added).

It is undisputed that a well capable of producing gas was completed prior to the end of the primary term and that Mesa timely made the required shut-in royalty payment prior to the end of the primary term. The primary term of the Mesa lease ended on September 11, 1977. In June, 1977, a well capable of producing gas in paying quantities was completed and shut-in. On August 31, 1977, during the primary term Mesa made a shut-in royalty payment of $314.20, twice the amount of the annual delay rental. Under the provisions of the lease this payment operated to extend the lease one year beyond the end of the primary term—until September 11, 1978. In February of 1978, Mesa commenced selling gas from said well and had done so continuously to this day.

Mitchell contends that under the compensatory royalty payment provisions, Mesa was required to make a compensatory royalty payment on or before August 20, 1977, and that, since Mesa failed to make such a payment, its lease was terminated. We disagree. Under the clear provisions of paragraph 19 Mesa was not required to make any compensatory royalty payments until September 11, 1978.

Before the compensatory royalty provision in Mesa's lease becomes applicable, either gas must have been sold and delivered in paying quantities from a well situated within one thousand feet of Tract "A" or drainage must be occurring. The record is rather skimpy as to such matters. Mesa contends there is no evidence in the record that either of these events occurred. The trial judge impliedly found that neither of these events occurred. Unless the record establishes conclusively that one or the other events occurred, this court must accept the implied finding of the trial court.

■ Assuming arguendo that the necessary events required to trigger the compensatory royalty occurred, the only thing that ceases by the happening of the events making the compensatory royalty provision applicable is the right to *further extend* the lease by making further shut-in royalty payments. The lease clearly and unequivocally states that, if a shut-in royalty payment is timely made, the lease shall be considered to be a producing lease and shall extend the term for a period of one year. In the case before us, this one-year period ran from September 11, 1977, to September 11, 1978. The well was completed as a shut-in well shortly before the end of the primary term and the required shut-in royalty payment was made before the end of the primary term. During this extended period of one year, actual production began and continued continuously thereafter. During this one-year period after the first shut-in royalty payment was made, Mesa was not required to make any compensatory royalty payments.

Mitchell also asserts that Mesa's oil and gas lease was canceled by the Veterans' Land Board. In support of this contention Mitchell apparently relies on the drainage clause in Mesa's lease providing that the lessee shall adequately protect the oil and gas under the land covered in the lease from drainage from adjacent land or leases. Mitchell does not set forth in his brief when such cancellation occurred, nor is there any-

thing in the record to show when such cancellation occurred. Mitchell apparently relies on the supposed approval of his oil and gas lease by the Chairman of the Veterans' Land Board as effectuating a cancellation.

In support of this contention he asserts that (1) the State of Texas has the reserve power to cancel leases and (2) if the land is being drained the State has the power to protect its natural resources. Mitchell concedes that the usual judicial remedy for failure to drill off-set wells is damages, but argues that under extraordinary circumstances cancellation of the lease is possible. It is his position that the Land Commissioner had the power to cancel the lease and did in fact cancel Mesa's lease.

■■■ This contention is subject to many problems. First, there is nothing in the record to show when such cancellation occurred. The record is devoid of any evidence that the tract was being drained at the time of the alleged cancellation. Assuming arguendo that it occurred at the time Mitchell took his lease, there is no evidence that the tract was being drained on that date. Mitchell failed to meet his burden of proving that drainage was occurring at the time the alleged cancellation occurred. Second, the mere approval of Mesa's lease by the Land Board Commissioner would not affect or release a valid existing lease. It is not unusual for a landowner to execute a second oil and gas lease while the first lease remains in effect. If properly executed, the second lease, normally called a "top lease," is a valid and effective lease, but it is secondary and subordinate to the already existing oil and gas lease. An absurd result would be reached if a landowner could, by giving a new lease on his land, effectively cancel a valid existing oil and gas lease, even a producing oil and gas lease. Third, the acts and conduct of the Veterans' Land Board do not indicate that it thought the Mesa lease was canceled or that it ever intended to cancel such lease. An administrative assistant of the Veterans' Land Board testified that he was familiar with the two leases here involved and

that with regard to the Mitchell lease the Veterans' Land Board was not aware at the time the Mitchell lease was approved that Mesa had a lease on the land; that Mitchell first called it to their attention sometime after the Mitchell lease had been approved; and that the Veterans' Land Board considered the Mesa lease to be primary and in effect. He further testified that the records of the Veterans' Land Board indicated that no bonus was paid to the Veterans' Land Board in connection with the Mitchell lease and that neither Mitchell nor anyone else ever paid or tendered any delay rentals under that lease. It is clear from the record that, after the Mitchell lease was approved, the Veterans' Land Board accepted an annual delay rental payment for Mesa under its lease, and thereafter also accepted a shut-in royalty payment from Mesa.

The trial court's implied finding that there was no intent to cancel the Mesa lease is amply supported by the record.

■■■ Cancellation of a lease is not self-effectuating and, even if the Commissioner did intend to cancel the lease, his subjective intent is not sufficient. A proper record of cancellation must be made. *Cobra Oil and Gas Corporation v. Sadler*, 447 S.W.2d 887, 892 (Tex.1968). There is no such record here.

■■■ Generally, the obligation to protect from drainage is a covenant, not a condition or limitation, and the lessor's remedy for such failure is a suit for damages, not forfeiture. *Christie, Mitchell & Mitchell Company v. Howell*, 359 S.W.2d 658, 660 (Tex.Civ.App.—Fort Worth 1962, writ ref'd n. r. e.). The remedy for breach of covenants is the suit for damages, not automatic termination. *Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 29 (1929); *Christie, Mitchell & Mitchell Company v. Howell*, 359 S.W.2d 658 (Tex.Civ.App.—Fort Worth 1962, writ ref'd n. r. e.).

It is clear that the Veterans' Land Board never instituted suit nor took any other action to recover damages or cancel the Mesa lease. The record indicates that the Veterans' Land Board always considered,

**514**

and still considers, the Mesa lease as valid and outstanding.

By a counterpoint, Mesa contends that, if Mitchell ever had an oil and gas lease, it terminated because Mitchell failed to pay or tender delay rentals. Paragraph 3 of the Mitchell lease reads as follows:

If no well be commenced on said land, hereby leased, on or before the 1st day of May, 1977, this lease shall terminate as to both parties, unless the Lessee on or before that date shall pay or tender to the the [sic] sum of $314.20 to the Veteran's Land Board of the State of Texas, at Austin, Texas, for credit to Lessor's account, which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve (12) months from said date.

■■■ This is the usual "unless" lease provision contained in customary Texas oil and gas leases. It is settled that on failure of the lessee either to begin a well or to pay the delay rentals under an "unless" lease, the lease *ipso facto* terminates on the date set for the action, and the estate reverts to the lessor without the necessity of re-entry, declaration of forfeiture, or legal action. *Waggoner Estate v. Sigler Oil Company*, 118 Tex. 509, 19 S.W.2d 27 (1929); *Gulf Production Co. v. Continental Oil Co.*, 139 Tex. 183, 164 S.W.2d 488 (1942); *Humble Oil & Refining Co. v. Mullican*, 144 Tex. 609, 192 S.W.2d 770.

It is undisputed that the delay rentals called for in the Mitchell lease were never paid, or tendered, as provided therein. Mitchell concedes this, but asserts that he called someone in the Veterans' Land Board, whose name he is not sure of, with regard to the payment of the delay rentals, that he was told by such person that the

Veterans' Land Board would not accept it and that, at that particular time, he just stopped trying to deal with the Board on the matter.

■■■ The trial judge impliedly found that the delay rentals required under the Mitchell lease were never paid or tendered to the Veterans' Land Board. The record clearly supports this finding. We have found no cases excusing an actual tender under circumstances equivalent to those existing in this case. In the cases cited by Mitchell at least one actual tender had been made to and refused by the lessor.[5]

We have concluded that, if Mitchell ever had a lease, it was terminated by failure to timely pay or tender delay rentals in accordance with the provisions of the lease.

Mesa also argues vigorously that Mitchell had no standing to challenge Mesa's lease.[6] In view of our holding herein we do not deem it necessary to pass on this contention.

In view of our holding herein it also is not necessary to consider Mesa's counterpoints about good faith improvements.

We hold that (1) Mitchell failed to prove a superior title to the premises involved; (2) Mesa had a valid oil and gas lease on Tract "A" which is still in force and effect; (3) Mitchell does not have a valid oil and gas lease on such tract which is still in force and effect; (4) if Mitchell ever had a valid oil and gas lease it was terminated by Mitchell's failure to timely pay delay rentals; (5) assuming arguendo that Mitchell has a valid oil and gas lease, it is inferior to the existing oil and gas lease held by Mesa; and (6) Mitchell did not meet the burden imposed on him as plaintiff in a trespass to try title suit.

5. Mesa also contends that no bonus was ever paid to the Veterans' Land Board by Mitchell and that the lease never became effective. There is testimony in the record by an employee of the Veterans' Land Board who was familiar with the lease that no bonus was ever paid or tendered to the Veterans' Land Board under this lease. The trial judge impliedly found that the bonus for appellant's lease was never paid or tendered to the Veterans' Land Board. In view of our holding, that if any lease ever

existed it was terminated for failure to timely pay the delay rentals, we need not pass on the effect of non-payment of a bonus payment under a Veterans' Land Board lease.

6. *See Colquitt v. Gulf Production Co.*, 52 S.W.2d 235 (Tex.Comm'n App.1932, judgmt. adopted); *Armstrong v. Penroc Oil and Gas Corporation*, 538 S.W.2d 12 (Tex.Civ.App.— Austin 1976, writ ref'd n. r. e.).

All of Mitchell's points of error are overruled. The judgment of the trial court is affirmed.